FILED
CLERK, U.S. DISTRICT COURT

NOV - 8 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JONATHAN MOORE, | ) | NO. CV 11-4197-VAP(E) |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ORDER ACCEPTING FINDINGS, |
| | ) | |
| MIKE McDONALD, Warden, | ) | CONCLUSIONS AND RECOMMENDATIONS OF |
| | ) | |
| Respondent. | ) | UNITED STATES MAGISTRATE JUDGE |
| | ) | |
| _____ | ) | |

Pursuant to 28 U.S.C. section 636, the Court has reviewed the Petition, all of the records herein and the attached Report and Recommendation of United States Magistrate Judge.  The Court accepts and adopts the Magistrate Judge's Report and Recommendation.

IT IS ORDERED that the Petition is denied and dismissed with prejudice.

///
///
///
///

1    IT IS FURTHER ORDERED that the Clerk serve copies of this Order,

2  the Magistrate Judge's Report and Recommendation and the Judgment

3  herein on Petitioner, and counsel for Respondent.

4

5    LET JUDGMENT BE ENTERED ACCORDINGLY.

6

7    DATED: _November 8_____, 2011.

8

9

10              _Virginia A Phillips_____

11              VIRGINIA A. PHILLIPS
                UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| JONATHAN MOORE, | ) | NO. CV 11-4197-VAP(E) |
| Petitioner, | ) | |
| v. | ) | REPORT AND RECOMMENDATION OF |
| MIKE McDONALD, Warden, | ) | UNITED STATES MAGISTRATE JUDGE |
| Respondent. | ) | |

This Report and Recommendation is submitted to the Honorable Virginia A. Phillips, United States District Judge, pursuant to 28 U.S.C. section 636 and General Order 05-07 of the United States District Court for the Central District of California.

**PROCEEDINGS**

Petitioner filed a "Petition for Writ of Habeas Corpus By a Person in State Custody" on May 17, 2011.  Respondent filed an Answer on July 8, 2011.  Petitioner did not file a Reply within the allotted time.

**BACKGROUND**

After a joint trial with co-defendants Vernon Johnson ("Johnson") and Michael Bennett ("Bennett") concerning events surrounding a gang-related shooting spree, a separate jury found Petitioner guilty of two counts of willful, deliberate, and premeditated attempted murder (Cal. Penal Code §§ 664 and 187(a), 667 and 187) (Counts 2 and 3), two counts of assault with a firearm (Cal. Penal Code § 245(a)(2)) (Counts 4 and 5), and one count of shooting at a motor vehicle (Cal. Penal Code § 246) (Count 6) (Reporter's Transcript ["R.T."] 4203-09; Clerk's Transcript (Moore) ["C.T. Moore"] 110-16).[1] As to Count 2, the jury found true the allegations that Petitioner, a principal, personally and intentionally used and discharged a firearm that proximately caused great bodily injury or death to Chaundi Grant ("Grant") (Cal. Penal Code § 12022.53(b), (c), (d), and (e)(1)) (R.T. 4204-05; C.T. Moore 110-11). As to Count 3, the jury found true the allegations that Petitioner, a principal, personally and intentionally used and discharged a firearm in attempting to murder Gerald Kelly, Jr. ("Kelly") (Cal. Penal Code § 12022.53(b), (c), and (e)(1)) (R.T. 4205-06; C.T. Moore 112-13). As to Count 4, the jury found true the allegation that Petitioner personally used a firearm to assault Grant (Cal. Penal Code § 12022.5) (R.T. 4206-07; C.T. Moore 114). As to Count 6, the jury found true the allegation that a principal personally and intentionally discharged a firearm in shooting at the

---

[1]     The jury found Petitioner not guilty of the first degree murder of Jose Saucedo as charged in Count 1, and not guilty of the lesser included offense to Count 1 of second degree murder (R.T. 4203-04; C.T. Moore 108-09).

1  vehicle occupied by Grant and Kelly, with the use causing great bodily

2  injury  (Cal. Penal Code §§ 12022.53(d)) (R.T. 4208; C.T. Moore 116).

3  As to all counts, the jury found true the allegations that the crimes

4  were committed for the benefit of, at the direction of, and in

5  association with a criminal street gang, with the specific intent to

6  promote, further and assist criminal conduct by gang members (Cal.

7  Penal Code § 186.22(b)(1)(C)) (R.T. 4205-08; C.T. Moore 111, 113-16).

8  The trial court sentenced Petitioner to a total term of eighty years

9  to life in state prison (R.T. 4812-14; C.T. Moore 147-48).

10

11      The Court of Appeal modified the defendants' sentences, but

12  otherwise affirmed the judgment (Respondent's Lodgments 10, 12; see

13  People v. Johnson, 2009 WL 3823890 (Cal. App. Dec. 15, 2009)).[2]  The

14  California Supreme Court denied Petitioner's petition for review

15  summarily (Respondent's Lodgment 16).

16

17                          **FACTUAL BACKGROUND**

18

19      Gabriel Njie testified that he was with Petitioner, Johnson and

20  Bennett on the night of the shootings (R.T. 1317-18).  Njie said that

21

22  _____

23      [2]    Specifically as to Petitioner's sentence, the Court of
    Appeal: (1) reversed the 25-year section 12022.53(d) enhancement
24  for Count 3, and imposed instead a 20-year section 12022.53(c)
    enhancement and stayed the 12022.53(b) enhancement; (2) reversed
25  the 10-year section 12022.5 and 10-year section 186.22(b)(1)(C)
    enhancements for Count 5, and imposed instead a 5-year section
26  186.22(b)(1)(B) enhancement; and (3) corrected the abstract of
    judgment to reflect the trial court's oral pronouncement of
27  judgment as to Count 4, which was the imposition and stay of a
    10-year section 12022.5 enhancement (Respondent's Lodgment 10 at
28  20-21, 23-24).

1  Johnson had called Njie a few days before the shootings and told Njie
2  that one of Johnson's friends had been killed (R.T. 1319).   Johnson
3  told Njie he had a chrome .357 gun and he wanted to "put in some work
4  for his friend," which Njie understood to mean that Johnson wanted to
5  "kill some of [Johnson's] enemies" or "shoot somebody" (R.T. 1319-20,
6  1372, 1374, 1376, 1380-82, 1574).[3]

7

8       On the evening of the shootings, Johnson told Njie to come to a
9  house at 108th Street to "put in some work" (R.T. 1320-22, 1376, 1378-
10 79).[4]  Njie drove his girlfriend's burgundy Saturn to the house and
11 picked up Johnson, then drove with Johnson to Bennett's house where
12 they found Bennett and Petitioner (R.T. 1321-24, 1378, 1383-84).
13 While Njie played video games, Johnson, Bennett and Petitioner went
14 into another room, then came out and said, "Let's go to the liquor
15 store" (R.T. 1325-26, 1385).   Njie drove Johnson and Petitioner in the
16 Saturn, and Bennett's girlfriend, Bennett and another person known as
17 "Little Mike" rode in a Mustang to the liquor store at 108th Street
18 and Western (R.T. 1326-27, 1387; see also Clerk's Transcript (Johnson/
19 Bennett) ("C.T. Johnson/Bennett") 726-27 (Petitioner's statement to
20 police admitting he was in the back seat of the Saturn with Njie and
21 Johnson)).   On the way, Njie stopped back at the house on 108th Street
22 ///
23 ///

24 ─────────────────

25       [3]   Njie explained that he and Johnson were going to "put
   in some work," meaning shoot somebody, anybody, to avenge their
26 friend's death (R.T. 1381-82, 1574-75).

27       [4]   The prosecution's gang expert testified that the house
   on 108th Street was a main gathering point or hangout for
28 Neighborhood Crips in 2005 and 2006 (R.T. 2435).

1 where he picked up Johnson to get some "weed" (R.T. 1327, 1385-86).[5]

2

3       Njie said he left the liquor store driving the Saturn with

4 Johnson in the passenger seat and Petitioner in the back seat behind

5 Johnson (R.T. 1329).  As Njie was leaving the store, a green Honda

6 almost hit Njie's Saturn so Njie began chasing the Honda (R.T. 1331-

7 32, 1389, 1395).  Njie could not catch up with the Honda, but the

8 Mustang drove past Njie and began chasing the Honda (R.T. 1332).  At

9 one point during the chase, Njie's Saturn got in front of the Mustang

10 (R.T. 1332).  When Njie's Saturn finally was next to the Honda, Njie

11 rolled down the passenger side window to talk to the driver of the

12 Honda (R.T. 1333-34, 1342, 1393).  At that point, Njie saw Johnson

13 pull out a gun and shoot the driver's window of the Honda (R.T. 1342-

14 44, 1393).  Njie said that he was nervous after the shooting, although

15 he had expected that the men would shoot people that evening since

16 they were out to "put in work" (R.T. 1344, 1374, 1378).  Njie pulled

17 over, but Johnson and Petitioner told Njie to start the car (R.T.

18 ///

19 ///

20 ///

21

22 _____

23       [5]   Njie testified that he never told Petitioner that Njie
and Johnson were going "on a mission" to shoot someone on the
24 night of the shootings (R.T. 1388).  Njie said he never heard
Johnson tell Petitioner what the men were doing (R.T. 1388).
25 Similarly, Njie said he never understood that Bennett was joining
in on "the mission" or told Bennett they were going on a mission
26 (R.T. 1400, 1411, 1528).  The prosecution's gang expert testified
that "putting in work" or going on a "mission" "is going out and
27 committing acts of violence, usually firearm-related assaults, to
avenge a fellow gang member's shooting or death" (R.T. 2428; see
28 also R.T. 2414-15 (discussing same)).

5

1 | 1345-46, 1396-97, 1399).[6]

2 |

3 |     Njie drove the Saturn to a gas station and then to a bowling

4 | alley, where Njie met up with Bennett, Little Mike and Bennett's

5 | girlfriend, and then they all returned to Bennett's house (R.T. 1346-

6 | 52, 1406-07, 1409).  After some time, Njie, Johnson and Petitioner

7 | left Bennett's house in the Saturn, this time with Johnson driving,

8 | Njie in the passenger seat, and Petitioner in the back (R.T. 1353-54,

9 | 1417).  Bennett, Bennett's girlfriend and Little Mike left in the

10 | Mustang (R.T. 1354).  The cars went to "Avenue Pirus," a Blood gang

11 | neighborhood, to shoot someone there because it was believed that

12 | someone from the Avenue Pirus gang had shot Johnson's friend (R.T.

13 | 1354, 1404-05, 1412-13, 1527-28, 1575).[7]

14 |

15 |     [6]   Three surviving passengers from the Honda, Rene
16 | Escalante, Arianna Meneses, and Miguel Gutierrez, each testified
    | that they were riding in the Honda with its driver, Jose Saucedo,
17 | when they encountered a Mustang near a liquor store at the
    | intersection of 108th and Western (R.T. 949-52, 960, 993-95,
18 | 1021-22).  The Mustang gave chase, and then a burgundy car pulled
    | alongside the Honda and the front passenger fatally shot Saucedo
19 | through the window of the Honda (R.T. 952-57, 970-71, 982-86,
    | 988-89, 995-98, 1002-03, 1023-24, 1034, 1036; see also R.T. 1883-
20 | 90 (medical examiner testifying concerning Saucedo's cause of
21 | death)).

22 |     [7]   Njie initially denied that he and Johnson were gang
    | members despite having told police earlier that Johnson was a
23 | member of the 111 Neighborhood Crips (R.T. 1354-56, 1372).
    | Later, however, Njie testified that Johnson was a 111
24 | Neighborhood Crip and that Njie had not testified to that fact
    | earlier because he had been scared (R.T. 1571-72).  The
25 | prosecution's gang expert testified that the Avenue Pirus are
26 | rivals of the 111 Neighborhood Crips (R.T. 2415).  The expert
    | testified that on December 26, 2005, days before the shooting
27 | incidents, a 115 Neighborhood Crip named Lionel Gentry was shot
    | and severely wounded, and the gang suspected either Avenue Pirus
28 | or the Watergate Crips had shot Gentry (R.T. 2416).

Once in the Avenue Pirus neighborhood, Njie saw a White Caprice that he thought had Avenue Pirus members inside based on the fact that the men in the car wore red (R.T. 1357, 1414-15, 1576).   Njie said Johnson tried to turn the Saturn around, but the Caprice drove away and parked elsewhere in the neighborhood (R.T. 1357-58, 1418-19). After some looking, Johnson found the Caprice and parked near the Caprice with the back of the Caprice pointing toward the Saturn (R.T. 1358, 1419-20, 1546-47).   Although Njie had made up his mind that he was going to shoot the people in the Caprice, when Johnson tried to hand Njie a gun Njie said "I don't want the gun." (R.T. 1358, 1420-21, 1512).   Johnson gave the gun to Petitioner who shot at the Caprice from out of the Saturn's back seat driver's side window (R.T. 1358, 1421-22).   The gun jammed when Petitioner first tried to fire, but Petitioner was able to get off one or two shots before the Caprice drove away (R.T. 1359-60, 1423-25, 1504, 1524-26, 1549).

Njie said Johnson turned the Saturn to follow the Caprice when the Mustang approached and passed the Saturn, with Bennett standing out of the Mustang's sunroof (R.T. 1359, 1507, 1525, 1550-51, 1554). The Mustang was now following the Caprice (R.T. 1507, 1513, 1552). Njie heard gunshots that sounded like they were in front of him, where the Mustang was driving (R.T. 1360, 1514-15).   Eventually, the Caprice turned onto another street, and the Saturn and Mustang returned to Bennett's house (R.T. 1361-62, 1515).

After spending a few minutes at Bennett's house, Njie, Johnson and Petitioner again left in the Saturn, and Bennett, Bennett's girlfriend and Little Mike left in the Mustang (R.T. 1363-64).   The

7

1    cars drove to the house on 108th Street, where the police showed up as

2    the cars were parking (R.T. 1364-65).[8]

3

4        Chaundi Grant, who was one of the men in the Caprice, testified

5    that he and his brother Gerald Kelly had gone out to get food that

6    evening (R.T. 1203-04).  As Grant was parking the Caprice, Kelly

7    noticed a car and said, "D, they about to bust," which Grant took to

8    mean that the people in the car were about to shoot (R.T. 1204-06).

9    By the time Grant looked over his shoulder, he saw gunfire coming out

10   of the driver's side back seat of a gray Mustang that had its back end

11   pointing toward the Caprice (R.T. 1206-07, 1212, 1221-22, 1227-28).

12   Grant said he was hit in the back of his head by the first shot and

13   then drove to try to get away from the other car (R.T. 1207-08, 1238).

14   The shooting continued as Grant drove away (R.T. 1208-09, 1223-26).[9]

15   At least four bullets struck the Caprice (R.T. 1213-18, 1237; see also

16   R.T. 1610-16 (responding Officer Olin testifying that the white car

17   was a Chevy Lumina that had multiple bullet holes)).  Grant drove

18   until the Mustang was no longer following him, at which point he

19   parked the Caprice and passed out from loss of blood (R.T. 1209-10).

20

21       Grant had a scar on the back of his head from the shot (R.T.

22   1208).  Grant said that the bullet "grazed" his head (R.T. 1239,

23   1248).  The wound required stitches and a return visit to the hospital

24   _____

25       [8]    The jury heard Njie explain that he was testifying for
     the prosecution in exchange for a lesser sentence for his part in
26   the crimes (R.T. 1313-17, 1517-18, 1520-22).

27       [9]    Grant testified that, to the best of his memory, all of
     the shots fired came from the Mustang (R.T. 1241).  Grant did not
28   testify about a Saturn being involved in his shooting.

                                    8

1  to remove the stitches (R.T. 1248).  Grant could not lie on the back

2  of his head for a while due to "pussing" and bleeding, but he fully

3  recovered from the physical injury by the time of trial (R.T. 1248-

4  49).  On cross-examination, Grant confirmed that he had suffered a

5  "fairly severe injury" to his head (R.T. 1251-52).

6

7      In Petitioner's statement to the police that was played for his

8  jury, Petitioner admitted having been with Johnson and Njie earlier in

9  the evening when Johnson shot the driver of the Honda (C.T.

10  Johnson/Bennett 733-34; see also R.T. 2114 (prosecution playing

11  statement for the jury)).  Petitioner admitted he told Njie to drive

12  away after the first shooting (C.T. Johnson/Bennett 735 (Petitioner

13  saying he told Njie, "Man, don't stop right here.  You better keep

14  going.")).  Petitioner was with Johnson after the first shooting when

15  Johnson went to Bennett's house and reloaded the gun (C.T.

16  Johnson/Bennett 741).  Petitioner said he understood Johnson as saying

17  that night, "We got to go ride," which meant "we got to go shoot

18  somebody" (C.T. Johnson/Bennett 827).

19

20                         **PETITIONER'S CONTENTIONS**

21

22      Petitioner contends:

23

24      1.  The evidence allegedly was insufficient to show an intent to

25  kill to support the attempted murder convictions (Counts 2 and 3)

26  (Ground One);

27  ///

28  ///

                                    9

1    2.   The evidence allegedly was insufficient to show that

2  Petitioner personally discharged a firearm causing great bodily injury

3  within the meaning of the special allegation findings on Counts 2 and

4  6 (Grounds Two and Three);

5

6    3.   The term "great bodily injury" allegedly is

7  unconstitutionally vague (Ground Four); and

8

9    4.   Petitioner's trial counsel allegedly rendered ineffective

10  assistance by failing to object to certain testimony from the

11  prosecution's gang expert (Ground Five).

12

13                     **STANDARD OF REVIEW**

14

15    A federal court may not grant an application for writ of habeas

16  corpus on behalf of a person in state custody with respect to any

17  claim that was adjudicated on the merits in state court proceedings

18  unless the adjudication of the claim: (1) "resulted in a decision that

19  was contrary to, or involved an unreasonable application of, clearly

20  established Federal law, as determined by the Supreme Court of the

21  United States"; or (2) "resulted in a decision that was based on an

22  unreasonable determination of the facts in light of the evidence

23  presented in the State court proceeding." 28 U.S.C. § 2254(d);

24  <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-26 (2002); <u>Early v. Packer</u>, 537

25  U.S. 3, 8 (2002); <u>Williams v. Taylor</u>, 529 U.S. 362, 405-09 (2000).

26

27    "Clearly established Federal law" refers to the governing legal

28  principle or principles set forth by the Supreme Court at the time the

1  state court renders its decision.  <u>Locker v. Andrade</u>, 538 U.S. 63

2  (2003).  A state court's decision is "contrary to" clearly established

3  Federal law if: (1) it applies a rule that contradicts governing

4  Supreme Court law; or (2) it "confronts a set of facts. . . materially

5  indistinguishable" from a decision of the Supreme Court but reaches a

6  different result.  <u>See</u> <u>Early v. Packer</u>, 537 U.S. at 8 (citation

7  omitted); <u>Williams v. Taylor</u>, 529 U.S. at 405-06.

8

9     Under the "unreasonable application prong" of section 2254(d)(1),

10  a federal court may grant habeas relief "based on the application of a

11  governing legal principle to a set of facts different from those of

12  the case in which the principle was announced."  <u>Locker v. Andrade</u>,

13  538 U.S. at 76 (citation omitted); <u>see also</u> <u>Woodford v. Visciotti</u>, 537

14  U.S. at 24-26 (state court decision "involves an unreasonable

15  application" of clearly established federal law if it identifies the

16  correct governing Supreme Court law but unreasonably applies the law

17  to the facts).  A state court's decision "involves an unreasonable

18  application of [Supreme Court] precedent if the state court either

19  unreasonably extends a legal principle from [Supreme Court] precedent

20  to a new context where it should not apply, or unreasonably refuses to

21  extend that principle to a new context where it should apply."

22  <u>Williams v. Taylor</u>, 529 U.S. at 407 (citation omitted).

23

24     "In order for a federal court to find a state court's application

25  of [Supreme Court] precedent 'unreasonable,' the state court's

26  decision must have been more than incorrect or erroneous."  <u>Wiggins v.</u>

27  <u>Smith</u>, 539 U.S. 510, 520 (2003) (citation omitted).  "The state

28  court's application must have been 'objectively unreasonable.'"  <u>Id.</u>

at 520-21 (citation omitted); see also Waddington v. Sarausad, 555
U.S. 179, 129 S. Ct. 823, 831 (2009); Davis v. Woodford, 384 F.3d 628,
637-38 (9th Cir. 2004), cert. dism'd, 545 U.S. 1165 (2005).  "Under
§ 2254(d), a habeas court must determine what arguments or theories
supported, . . . or could have supported, the state court's decision;
and then it must ask whether it is possible fairminded jurists could
disagree that those arguments or theories are inconsistent with the
holding in a prior decision of this Court."  Harrington v. Richter,
131 S. Ct. 770, 786 (2011).  This is "the only question that matters
under § 2254(d)(1)."  Id. (citation and internal quotations omitted).
Habeas relief may not issue unless "there is no possibility fairminded
jurists could disagree that the state court's decision conflicts with
[the United States Supreme Court's] precedents."  Id. at 786-87 ("As a
condition for obtaining habeas corpus from a federal court, a state
prisoner must show that the state court's ruling on the claim being
presented in federal court was so lacking in justification that there
was an error well understood and comprehended in existing law beyond
any possibility for fairminded disagreement.").

        In applying these standards, the Court looks to the last reasoned
state court decision, here the decision of the California Court of
Appeal.  See Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir.
2008).

        Additionally, federal habeas corpus relief may be granted "only
on the ground that [Petitioner] is in custody in violation of the
Constitution or laws or treaties of the United States."  28 U.S.C. §
2254(a).  In conducting habeas review, a court may determine the issue

1  of whether the petition satisfies section 2254(a) prior to, or in lieu

2  of, applying the standard of review set forth in section 2254(d).

3  Frantz v. Hazey, 533 F.3d 724, 736-37 (9th Cir. 2008) (en banc).

4

5  <center>DISCUSSION[10]</center>

6

7  **I.   Petitioner's Challenges to the Sufficiency of the Evidence to**

8  **Support Petitioner's Convictions Do Not Merit Habeas Relief.**

9

10  In Grounds One, Two, and Three, Petitioner contends that there

11  was insufficient evidence to support his attempted murder convictions

12  and the jury's special circumstances findings that Petitioner

13  personally discharged a firearm causing great bodily injury (Petition,

14  Grounds One, Two and Three).  As explained below, none of Petitioner's

15  contentions merit habeas relief.

16

17  **A.   Governing Legal Standards**

18

19  On habeas corpus, the Court's inquiry into the sufficiency of

20  evidence is limited.  Evidence is sufficient unless the charge was "so

21  totally devoid of evidentiary support as to render [Petitioner's]

22  conviction unconstitutional under the Due Process Clause of the

23  Fourteenth Amendment."  Fish v. Cardwell, 523 F.2d 976, 978 (9th Cir.

24  1975), cert. denied, 423 U.S. 1062 (1976) (citations and quotations

25  omitted).  A conviction cannot be disturbed unless the Court

26  _____

27  [10]   The Court has read, considered and rejected on the
merits all of the contentions raised in the Petition.  The Court
28  discusses Petitioner's principal contentions herein.

<center>13</center>

1  determines that no "rational trier of fact could have found the

2  essential elements of the crime beyond a reasonable doubt."  Jackson

3  v. Virginia, 443 U.S. 307, 317 (1979).

4

5     Jackson v. Virginia establishes a two-step analysis for a

6  challenge to the sufficiency of the evidence.  United States v.

7  Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc).  "First, a

8  reviewing court must consider the evidence in the light most favorable

9  to the prosecution."  Id. (citation omitted); see also McDaniel v.

10 Brown, 130 S. Ct. 665, 673 (2010).[11]  At this step, a court "may not

11 usurp the role of the trier of fact by considering how it would have

12 resolved the conflicts, made the inferences, or considered the

13 evidence at trial."  United States v. Nevils, 598 F.3d at 1164

14 (citation omitted).  "Rather, when faced with a record of historical

15 facts that supports conflicting inferences a reviewing court must

16 presume - even if it does not affirmatively appear in the record -

17 that the trier of fact resolved any such conflicts in favor of the

18 prosecution, and must defer to that resolution."  Id. (citations and

19 internal quotations omitted).  The State need not rebut all reasonable

20 interpretations of the evidence or "rule out every hypothesis except

21 that of guilt beyond a reasonable doubt at the first step of Jackson

22 [v. Virginia]."  Id. (citation and internal quotations omitted).

23

24    At the second step, the court "must determine whether this

25

26  _____

27      [11]    The Court must conduct an independent review of the
    record when a habeas petitioner challenges the sufficiency of the
    evidence.  See Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir.

28 1997).

1 | evidence, so viewed, is adequate to allow *any* rational trier of fact
2 | to find the essential elements of the crime beyond a reasonable
3 | doubt." <u>United States v. Nevils</u>, 598 F.3d at 1164 (citation and
4 | internal quotations omitted; original emphasis).  A reviewing court
5 | "may not ask itself whether *it* believes that the evidence at the trial
6 | established guilt beyond a reasonable doubt."  <u>Id.</u> (citations and
7 | internal quotations omitted; original emphasis).

8 |

9 | This Court cannot grant habeas relief on Petitioner's challenges
10 | to the sufficiency of the evidence unless the state court's decision
11 | constituted an "unreasonable application of" <u>Jackson v. Virginia</u>.
12 | <u>See Juan H. v. Allen</u>, 408 F.3d 1262, 1274-75 (9th Cir. 2005), <u>cert.</u>
13 | <u>denied</u>, 546 U.S. 1137 (2006).

14 |

15 |  **B.   The Evidence Was Sufficient to Support Petitioner's**
16 |       **Attempted Murder Convictions.**

17 |

18 | Petitioner contends the evidence was insufficient to show he
19 | harbored an intent to kill Grant and Kelly.  Petitioner argues that
20 | the uncontradicted evidence showed that the gunfire came from a
21 | different vehicle (not the one in which Petitioner was seated), and
22 | that, out of fear, Petitioner accepted the gun that was handed to him
23 | and shot into the air.  Petitioner maintains that there was no direct
24 | evidence that he shot at the victims or intended to shoot at the
25 | victims, and no circumstantial evidence to support a finding that he
26 | intended to kill.  <u>See</u> Petition, Ground One.

27 |

28 | The Court of Appeal rejected this argument, finding that there

1  was "substantial circumstantial evidence" from which the trier of fact
2  reasonably could have found that Petitioner intended to kill when he
3  shot the gun (Respondent's Lodgment 10 at 10).   The Court of Appeal
4  based this conclusion on Petitioner's recorded statement that was
5  played for the jury, and evidence suggesting that Petitioner: knew the
6  group's purpose before the group left for rival gang territory, knew
7  that Johnson wanted to avenge the shooting of a fellow gang member,
8  had witnessed Johnson shoot Saucedo earlier in the evening, and
9  actually fired the gun twice from his car at Grant and Kelly, striking
10 Grant in the head with one bullet (Respondent's Lodgment 10 at 10).
11 The Court of Appeal also found "no substantial evidence that any
12 explicit threat motivated [Petitioner's] conduct" (Id.).   Petitioner
13 admitted to police that Njie refused to fire the gun without adverse
14 consequence, suggesting that Petitioner likewise could have refused to
15 fire the gun (Id.).

16

17      The Court of Appeal's determination was not objectively
18 unreasonable.   To prove attempted murder, the prosecution was required
19 to show that Petitioner had the specific intent to kill, and committed
20 a direct but ineffectual act toward accomplishing the intended
21 killing.   People v. Lee, 31 Cal. 4th 613, 623, 3 Cal. Rptr. 3d 402, 74
22 P.3d 176 (2003), cert. denied, 541 U.S. 947 (2004) (citations
23 omitted); People v. Smith, 37 Cal. 4th 733, 739-40, 37 Cal. Rptr. 163,
24 124 P.3d 730 (2005).   For attempted *premeditated* murder, the
25 prosecution needed to show that the intended killing was "thought over
26 in advance."   People v. Brady, 50 Cal. 4th 547, 561, 113 Cal. Rptr. 3d
27 458, 236 P.3d 312 (2010), cert. denied, 131 S. Ct. 2874 (2011) ("An
28 intentional killing is premeditated and deliberate if it occurred as

1  the result of preexisting thought and reflection rather than
2  unconsidered or rash impulse.") (citation and quotations omitted).[12]
3  From the evidence adduced at trial, a rational trier of fact could
4  have found beyond a reasonable doubt that Petitioner harbored the
5  requisite intent to kill.

6

7       As summarized above, Njie's testimony established that Petitioner
8  fired one or two shots at the car occupied by Grant and Kelly, after
9  taking a moment to clear a jam from the gun (R.T. 1359-60, 1423-25,
10  1504, 1524-26, 1549).  Although Grant testified that he thought he was
11  shot from someone in the grey Mustang, Grant also testified that he
12  was hit in the back of his head and injured by the first shot fired
13  (R.T. 1207-08, 1238, 1241).  Njie testified that the first shot was
14  fired by Petitioner, before the Mustang arrived (R.T. 1358-59).
15  Petitioner's own statement to the police included bragging that he
16  thought he "got" Grant when he shot at the car (C.T. Johnson/Bennett
17  768).  This evidence reasonably supported the inference that
18  Petitioner harbored the specific intent to kill.  See People v. Perez,
19  50 Cal. 4th 222, 230, 112 Cal. Rptr. 3d 310, 234 P.3d 557 (2010)
20  (defendant's act of firing a shot into a group of people from a

21

22  _____

23  [12]  A jury finding that an attempted murder was
    premeditated increases the length of the defendant's sentence to
    an indeterminate life term with the possibility of parole.  Cal.
24  Penal Code § 664(a); People v. Seel, 34 Cal. 4th 535, 548, 21
    Cal. Rptr. 3d 179, 100 P.3d 870 (2004).  Thus, the premeditation
25  allegation for attempted murder "is the functional equivalent of
    an element of a greater offense."  Seel, 34 Cal. 4th at 548
26  (citations and internal quotations omitted); see People v. Hart,
27  176 Cal. App. 4th 662, 672, 97 Cal. Rptr. 3d 827 (2009)
    ("Attempted premeditated murder is the functional equivalent of a
28  greater offense than attempted unpremeditated murder.").

distance of 60 feet showed intent to kill); <u>People v. Felix</u>, 172 Cal.
App. 4th 1618, 1625-26, 92 Cal. Rptr. 3d 239 (2009) (firing two shots
into lighted master bedroom from close range showed intent to kill);
<u>People v. Vang</u>, 87 Cal. App. 4th 554, 564, 104 Cal. Rptr. 2d 704
(2001) (firing wall-piercing firearms at homes of rival gang members
showed intent to kill); <u>see also</u> <u>United States v. Jones</u>, 425 F.2d
1048, 1055 (9th Cir.), <u>cert. denied</u>, 400 U.S. 823 (1970) (testimony of
one witness, if believed, sufficient to prove a fact); <u>United States
v. Foster</u>, 243 Fed. App'x 315, 316 (9th Cir. 2007) (testimony of one
witness sufficient, and "the resolution of any question as to his
credibility is properly entrusted to the jury") (citations, internal
quotations and brackets omitted).[13]  The mere fact that Petitioner
failed to kill Grant or Kelly is not necessarily inconsistent with
Petitioner having harbored an intent to kill.  <u>See</u> <u>People v. Lashley</u>,
1 Cal. App. 4th 938, 945, 2 Cal. Rptr. 2d 629 (1991), <u>cert. denied</u>,
506 U.S. 842 (1992) (attempted murder victim's escape from death due
to "poor marksmanship" did not show lack of intent to kill).

     Petitioner advances an alternative interpretation of the evidence
(<u>i.e.</u>, that he shot in the air, without intending to strike either
Grant or Kelly) (<u>see</u> C.T. Johnson/Bennett 767-70, 775, 817 (transcript
of Petitioner's interview with the police that was played for the jury
wherein Petitioner claims that he just shot three times in the air and
told Johnson, "Yeah, I think I did.  I think I got him" only to
satisfy Johnson); <u>but see</u> C.T. 771 Johnson/Bennett (Petitioner

---

[13]     The Court may cite unpublished Ninth Circuit opinions
issued on or after January 1, 2007.  <u>See</u> U.S. Ct. App. 9th Cir.
Rule 36-3(b); Fed. R. App. P. 32.1(a).

1  admitting he shot out of the window)).  However, this Court must view

2  the evidence in the light most favorable to the prosecution, and must

3  resolve all reasonable inferences in favor of the verdict.  See United

4  States v. Nevils, 598 F.3d at 1164 (habeas court "may not usurp the

5  role of the trier of fact by considering how [the court] would have

6  resolved the conflicts, made the inferences, or considered the

7  evidence at trial").  Because the Court of Appeal's determination

8  regarding the sufficiency of the evidence was reasonable, Petitioner

9  is not entitled to habeas relief on Ground One of the Petition.  See

10  28 U.S. § 2254(d); Harrington v. Richter, 131 S. Ct. at 785-87.

11

12  **C.  The Evidence Was Sufficient to Prove that Petitioner**

13  **Personally Discharged a Firearm Causing Great Bodily Injury.**

14

15  Petitioner received sentence enhancements of 25 years to life on

16  Counts 2 and 6 pursuant to California Penal Code section 12022.53(d),

17  based on the jury's finding that Petitioner personally discharged a

18  firearm causing great bodily injury to Grant (R.T. 4204-05, 4812-14;

19  C.T. Moore 110-11, 147-48).  Section 12022.53(d) authorizes a sentence

20  enhancement for "any person who, in the commission of a felony

21  [including attempted murder and shooting at a motor vehicle]

22  personally and intentionally discharges a firearm and proximately

23  causes great bodily injury, as defined in [Penal Code] Section

24  12022.7, . . . to any person other than an accomplice."  See Cal.

25  Penal Code § 12022.53(d) (referencing Cal. Penal Code §§ 246 (shooting

26  at a motor vehicle) and 12022.53(a)(1), (18) (attempted murder)); see

27  also Cal. Penal Code § 12022.7(f) (defining "great bodily injury" as

28  "significant or substantial physical injury").  Petitioner asserts

19

1  that the evidence was insufficient to prove that he caused great

2  bodily injury, arguing that the bullet only grazed the back of Grant's

3  head (Petition, Ground Two).   Petitioner also asserts that the

4  evidence was insufficient to prove that Petitioner actually fired the

5  shot causing Grant's injury (Petition, Ground Three).

6

7      The Court of Appeal rejected these claims, finding that jurors

8  reasonably could have concluded that Grant suffered great bodily

9  injury and that Petitioner fired the shot causing the injury

10  (Respondent's Lodgment 10 at 10-12).   As to the former, the Court of

11  Appeal reasoned that Grant lost a great deal of blood, passed out

12  following the shooting, and required follow-up care (Id. at 12).

13

14      Viewing the evidence in the light most favorable to the

15  prosecution, a reasonable jury could have concluded that Petitioner

16  fired the shot that struck Grant.   Njie's testimony and Petitioner's

17  own statement to the police showed that Petitioner fired the first

18  shot at Grant's car (R.T. 1359-60, 1423-25, 1504, 1524-26, 1549; C.T.

19  Johnson/Bennett 767-70, 775, 817).   Grant testified that the first

20  shot struck him (R.T. 1207-08, 1238).

21

22      Under California Penal Code section 12022.7, the concept of a

23  "significant or substantial physical injury" "contains no specific

24  requirement that the victim suffer 'permanent,' 'prolonged' or

25  'protracted' disfigurement, impairment, or loss of bodily function."

26  People v. Escobar, 3 Cal. 4th 740, 750, 12 Cal. Rptr. 2d 586, 837 P.2d

27  1100 (1992) (disapproving People v. Caudillo ("Caudillo"), 21 Cal. 3d

28  562, 146 Cal. Rptr. 859, 580 P.2d 274 (1978)).   The injury need only

1  be a "substantial injury *beyond* that inherent in the offense itself."

2  Id. at 746-47, 750 (citations omitted) (finding that rape victim who

3  suffered extensive bruises and abrasions to her legs, knees and

4  elbows, injury to her neck, and soreness to her vaginal area that

5  impaired her ability to walk had suffered "great bodily injury";

6  injuries went beyond those "necessarily present" in the offense of

7  rape). "Proof that a victim's bodily injury is 'great'. . . is

8  commonly established by evidence of the severity of the victim's

9  physical injury, the resulting pain, or the medical care required to

10 treat or repair the injury." People v. Cross, 45 Cal. 4th 58, 66, 82

11 Cal. Rptr. 3d 373, 190 P.3d 706 (2008) (citations omitted).

12

13     In Petitioner's case, the bullet struck Grant in the back of the

14 head, causing Grant to pass out from blood loss (R.T. 1207-10).

15 Although Grant described his wound as "only a graze," the wound

16 required stitches and aftercare due to "pussing and bleeding" (R.T.

17 1248). Grant could not lie on the back of his head while the wound

18 healed (R.T. 1248). From this evidence, a reasonable jury could have

19 concluded that Petitioner's act of firing the gun at Grant's head and

20 striking Grant with the bullet caused Grant to suffer great bodily

21 injury beyond that inherent in an attempted murder or in shooting at a

22 motor vehicle. See People v. Wolcott, 34 Cal. 3d 92, 96, 107, 192

23 Cal. Rptr. 748, 665 P.2d 520 (1983) (although shooting victim's

24 injuries consisting of tearing of victim's calf muscle and bullet

25 fragments lodging in the victim's arms and legs (with no need for

26 sutures and little blood loss) were "less serious than is typical of

27 gunshot wounds," they were substantial enough to justify finding of

28 great bodily injury); People v. Le, 137 Cal. App. 4th 54, 57-58, 39

1   Cal. Rptr. 3d 741 (2006) (shooting victim suffered great bodily injury

2   where victim could not stand, walk or sit unassisted for weeks after

3   shooting; fact that victim suffered only soft tissue injury was

4   immaterial); People v. Lopez, 176 Cal. App. 3d 460, 465, 222 Cal.

5   Rptr. 83 (1986) (under the stricter standard set forth in Caudillo,

6   shooting victim who immediately fell to the ground upon being shot,

7   screamed, and was disoriented suffered great bodily injury); compare

8   People v. Martinez, 171 Cal. App. 3d 727, 734-35, 217 Cal. Rptr. 546

9   (1985) (finding that female victim who suffered cut tendons on two of

10  her fingers from grabbing her attacker's knife, who likely would have

11  limited use of those fingers for the rest of her life suffered great

12  bodily injury, whereas male victim who suffered only a "minor

13  laceration-type injury" to the middle of his back that required no

14  treatment did not suffer great bodily injury).[14]

15  ——————————————

16  [14]     Petitioner argues that the judge at the preliminary
    hearing found the same evidence insufficient to hold Petitioner
17  for trial on the great bodily injury allegation.  See Petition,
    Ground Two.  The transcript from Petitioner's preliminary hearing
18  reveals that the judge struck the special circumstances
    allegation for Count 4 (assault with a firearm) for inflicting
19  great bodily injury from discharging a firearm from a motor
    vehicle.  See C.T. Johnson/Bennett 304-05 (judge at preliminary
20  hearing noting, "I don't think that on the basis of the record
    that there was great bodily injury sustained. . . . all I heard
21  was [Grant] had stitches in his head and he has a scar.  I don't
    think that's great bodily injury, so I'm striking that allegation
22  pursuant to [section] 12022.55.").  The judge did not strike the
    allegation that a principal personally discharged a weapon
23  causing great bodily injury in attempting to murder Grant.  See
    C.T. 302-04.  In any event, the views of the preliminary hearing
24  judge are not binding on the California Court of Appeal or on
    this federal Court.  See People v. Thrasher, 176 Cal. App. 4th
25  1302, 1307, 98 Cal. Rptr. 693, 696 (2009) ("We independently
    review the preliminary hearing magistrate's order binding
26  defendant over for trial"); Barker v. Fleming, 423 F.3d 1085,
    1092-93 (9th Cir. 2005), cert. denied, 547 U.S. 1138 (2006)
27                                                    (continued...)

28

1    For the foregoing reasons, the Court of Appeal's rejection of

2    these claims was not contrary to, or an objectively unreasonable

3    application of, any clearly established Federal law as determined by

4    the United States Supreme Court.  See 28 U.S. § 2254(d); Harrington v.

5    Richter, 131 S. Ct. at 785-87.  Petitioner is not entitled to habeas

6    relief on Grounds Two and Three of the Petition.

7

8    II.   **Petitioner's Claim that the Term "Great Bodily Injury" is**

9          **Unconstitutionally Vague Does Not Merit Habeas Relief.**

10

11    In Ground Four, Petitioner asserts that the statutory definition

12    of "great bodily injury" for the special circumstances allegations is

13    so vague as to violate due process (Petition, Ground Four).

14    Petitioner contends that discriminatory enforcement is "inevitable,"

15    and that if "great bodily injury" were more clearly defined there is a

16    reasonable probability that the jury would have found Grant did not

17    suffer great bodily injury (Petition, Ground Four).

18

19    California Penal Code sections 186.22(b)(1)(B) and (b)(1)(C),

20    12022.5(d), 12022.53(d) and (e)(1), as applicable to Petitioner (see

21    C.T. Moore 110-16 (verdicts), Respondent's Lodgment 10 at 20-21, 23-24

22    (modifying Petitioner's sentence)), each provide for sentence

23    enhancements where specified crimes involve the infliction of "great

24    bodily injury."  See Cal. Penal Code § 186.22(b)(1)(B) and (C)

25    (providing for additional penalty for participation in a criminal

26    _____

27    [14](...continued)
      ("When more than one state court has adjudicated a claim, we
28    analyze the last reasoned decision").

23

1  street gang where person is convicted of "serious" or "violent"

2  felony, as defined in Penal Code sections 1192.7(c) and 667.5(c),

3  respectively, to include a felony in which the defendant inflicts

4  great bodily injury); Cal. Penal Code § 12022.5(d) (providing for

5  additional penalty where defendant who commits assault with a firearm

6  shoots the firearm from a motor vehicle at someone outside the motor

7  vehicle under Penal Code section 245, with intent to cause great

8  bodily injury); Cal. Penal Code § 12022.53(d) and (e)(1) (providing

9  sentence enhancement for attempted murder and shooting at an occupied

10  vehicle under Penal Code section 246, where shooting causes great

11  bodily injury).  As noted above, California Penal Code section

12  12022.7, which governs enhancements for persons inflicting great

13  bodily injury while committing or attempting felony offenses, defines

14  "great bodily injury" as a "significant or substantial physical

15  injury."  See Cal. Penal Code § 12022.7(f).  The trial court

16  instructed Petitioner's jury: "The term 'great bodily injury' means a

17  significant or substantial physical injury.  Minor, trivial or

18  moderate injuries do not constitute great bodily injury" (C.T. Moore

19  106-07).

20

21      The California Court of Appeal rejected Petitioner's vagueness

22  claim, observing that the term "great bodily injury" has been used in

23  California law for over a century without further definition, and that

24  courts have consistently held "great bodily injury" is not a technical

25  term that requires elaboration.  See Respondent's Lodgment 10 at 16-17

26  (citing, inter alia, People v. Maciel, 113 Cal. App. 4th 679, 686, 6

27  Cal. Rptr. 3d 628 (2003), and In re Mariah T., 159 Cal. App. 4th 428,

28  436-37, 71 Cal. Rptr. 3d 542 (2008).  The Court of Appeal's decision

1  was not unreasonable.

2

3       A criminal statute is unconstitutionally vague when it "fails to
4  give a person of ordinary intelligence fair notice that his
5  contemplated conduct is forbidden by the statute."  United States v.
6  Harriss, 347 U.S. 612, 617 (1954); see also United States v.
7  Batchelder, 442 U.S. 114, 123 (1979); United States v. Chapman, 528
8  F.3d 1215, 1220 (9th Cir. 2008); United States v. Gallagher, 99 F.3d
9  329, 334 (9th Cir. 1996), cert. denied, 520 U.S. 1129 (1997).  "To
10 satisfy due process, 'a penal statute [must] define the criminal
11 offense [1] with sufficient definiteness that ordinary people can
12 understand what conduct is prohibited and [2] in a manner that does
13 not encourage arbitrary and discriminatory enforcement.'"  Skilling v.
14 United States, 130 S. Ct. 2896, 2927-28 (2010) (quoting Kolender v.
15 Lawson, 461 U.S. 352, 357 (1983)); United States v. Kilbride, 584 F.3d
16 1240, 1256-57 (9th Cir. 2009) (even under heightened standards of
17 clarity for statutes involving criminal sanctions, "due process does
18 not require impossible standards of clarity"; quoting Kolender v.
19 Lawson, 461 U.S. at 361); see also Maynard v. Cartwright, 486 U.S.
20 356, 361 (1988) ("Objections to vagueness under the Due Process Clause
21 rest on lack of notice, and hence may be overcome in any specific case
22 where reasonable persons would know that their conduct is at risk.").

23

24      To avoid a vagueness challenge based on the potential for
25 arbitrary enforcement, statutes must include "minimal guidelines to
26 govern law enforcement."  Kolender v. Lawson, 461 U.S. at 358
27 (citation and quotations omitted); see also City of Chicago v.
28 Morales, 527 U.S. 41, 60 (1999); United States v. Davis, 36 F.3d 1424,

1 | 1434 (9th Cir. 1994), <u>cert. denied</u>, 513 U.S. 1171 (1995).  "Where the

2 | legislature fails to provide such minimal guidelines, a criminal

3 | statute may permit a standardless sweep that allows policemen,

4 | prosecutors, and juries to pursue their personal predilections."

5 | <u>Kolender v. Lawson</u>, 461 U.S. at 358 (citation, quotations and brackets

6 | omitted).

7 |

8 |       Alleged vagueness should be judged in light of the conduct

9 | involved.  <u>See</u>, <u>e.g.</u>, <u>United States v. Powell</u>, 423 U.S. 87, 92-93

10 | (1975).  To show entitlement to habeas relief, Petitioner must show

11 | the sentencing enhancements for "great bodily injury" are vague as

12 | applied to Petitioner, for "[u]nless First Amendment freedoms are

13 | implicated, a vagueness challenge may not rest on arguments that the

14 | law is vague in its hypothetical applications, but must show that the

15 | law is vague as applied to the facts of the case at hand."  <u>United</u>

16 | <u>States v. Johnson</u>, 130 F.3d 1352, 1354 (9th Cir. 1997) (<u>citing</u> <u>Chapman</u>

17 | <u>v. United States</u>, 500 U.S. 453, 467 (1991)); <u>see also</u> <u>United States v.</u>

18 | <u>Gallagher</u>, 99 F.3d at 334.

19 |

20 |       As applied in Petitioner's case, the sentencing enhancement

21 | statutes are not unconstitutionally vague.  First, an ordinary person

22 | plainly would understand that shooting a gun at an occupied vehicle

23 | and striking the driver in the back of the head would be prohibited

24 | conduct.  Per California Penal Code section 12022.7(f), Petitioner was

25 | on notice that causing any "significant or substantial physical

26 | injury" would subject him to criminal liability.  Minimally, the act

27 | of firing a gun at a person and hitting that person in the back of the

28 | head carries a risk of causing "significant or substantial physical

1  injury" such that a person of ordinary intelligence would be on notice

2  of potential liability.  See, e.g., People v. Wolcott, 34 Cal. 3d 92,

3  96-97, 192 Cal. Rptr. 748, 665 P.2d 520 (1983) (case predating

4  Petitioner's conviction upholding finding that defendant intentionally

5  inflicted great bodily injury by shooting at victim during struggle

6  and striking victim in the calf, where victim's injuries "were

7  fortunately less serious than is typical of gunshot wounds"); People

8  v. Miller, 18 Cal. 3d 873, 883, 135 Cal. Rptr. 654, 558 P.2d 553

9  (1977) (same where defendant shot twice at victim, piercing the

10 victim's arm), overruled on other grounds recognized, People v. Oates,

11 32 Cal. 4th 1048, 1067, n.8, 12 Cal. Rptr. 3d 325, 88 P.3d 56 (2004);

12 People v. Lopez, 176 Cal. App. 3d 460, 462, 465, 222 Cal. Rptr. 83

13 (1986) (same where defendant shot at victims, striking one victim in

14 "the right cheek of the hip" who felt nothing except striking the

15 ground, and striking another victim in the thigh who felt "fire" in

16 her leg).

17

18      Second, the sentencing enhancement statutes include "minimal

19 guidelines" to govern those who apply the law.  Kolender v. Lawson,

20 461 U.S. at 358.  As described above, the statutes define "great

21 bodily injury" to include only "significant or substantial physical

22 injury" (Cal. Penal Code § 12022.7(f)).  The standard jury

23 instructions as given further explain that "minor, trivial or

24 moderate" injuries do not constitute great bodily injury.  See C.T.

25 Moore 106-07 (instructing the jury with CALJIC 17.19.5).  These

26 definitions provide sufficient guidelines for police, prosecutors and

27 juries to follow rather than following their own personal

28 predilections.  Kolendar v. Lawson, 461 U.S. at 358.  Moreover, the

1   statutes at issue for the underlying offenses to which the

2   enhancements attach (i.e., Cal. Penal Code sections 186.22, 12022.5,

3   and 12022.53), require that the defendant intentionally promote,

4   further or assist felonious conduct by gang members, intentionally

5   shoot a firearm at a person outside of a vehicle with intent to

6   inflict great bodily injury, or intentionally discharge a firearm in

7   the commission of an attempted murder, respectively.  See Cal. Penal

8   Code §§ 186.22(b)(1), 12022.5(d), 12022.53(d).  Such scienter

9   requirements further limit the discretion of law enforcement and

10  further mitigate any possible vagueness.  See United States v. Wyatt,

11  408 F.3d 1257, 1261 (9th Cir.), cert. denied, 546 U.S. 949 (2005)

12  (citing Posters 'N' Things, Ltd. v. United States, 511 U.S. 513, 526

13  (1994)).

14

15       For the foregoing reasons, the Court of Appeal's rejection of

16  Petitioner's vagueness claim was not contrary to, or an objectively

17  unreasonable application of, any clearly established Federal law as

18  determined by the United States Supreme Court.  See 28 U.S. § 2254(d);

19  Harrington v. Richter, 131 S. Ct. at 785-87.  Petitioner is not

20  entitled to habeas relief on Ground Four of the Petition.[15]

21  _____

22  [15]     To the extent Petitioner may argue that "great bodily
    injury" should be interpreted as requiring that the victim suffer
23  "permanent," "prolonged" or "protracted" disfigurement,
    impairment or loss of bodily function under California law,
24  Petitioner is not entitled to habeas relief.  The California
    Supreme Court declined Petitioner's invitation so to interpret
25  "great bodily injury" (Respondent's Lodgment 16), and it is not
    for this Court to reexamine that court's determination on this
26  state law issue.  See Waddington v. Sarausad, 555 U.S. 179, 192
27  n.5 (2009) ("we have repeatedly held that it is not the province
    of a federal habeas court to reexamine state-court determinations
28                                                       (continued...)

1 | **III. Petitioner's Claim of Ineffective Assistance of Counsel Does Not**

2 | **Merit Habeas Relief.**

3 |

4 | In Ground Five, Petitioner alleges that his counsel was

5 | ineffective for failing to object to assertedly improper testimony by

6 | the prosecution's gang expert.  Petitioner contends that the gang

7 | expert speculated concerning the thoughts and intentions of the

8 | defendants in a way prohibited by California law  (Petition, Ground

9 | Five).  Specifically, Petitioner contends the expert improperly opined

10 | that:  (1) the defendants may have wanted to avenge a shooting of a

11 | member of an affiliated gang; (2) the defendants may have mistaken the

12 | victims for rival gang members; and (3) Petitioner's gang would

13 | benefit because the public would take the victims for members of a

14 | rival gang (Petition, Ground Five).

15 |

16 | A.   **Governing Legal Standards**

17 |

18 | To establish ineffective assistance of counsel, Petitioner must

19 | prove:  (1) counsel's representation fell below an objective standard

20 | of reasonableness; and (2) there is a reasonable probability that, but

21 | for counsel's errors, the result of the proceeding would have been

22 | different.  <u>Strickland v. Washington</u>, 466 U.S. 668, 688, 694, 697

23 | (1984) ("<u>Strickland</u>").  A reasonable probability of a different result

24 |

25 | [15](...continued)

26 | on state-law questions") (citation and internal quotations
   omitted); <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005) ("a state

27 | court's interpretation of state law, including one announced on
   direct appeal of the challenged conviction, binds a federal court

28 | sitting in habeas corpus").

Case 2:11-cv-04197-VAP-E   Document 15   Filed 11/08/11   Page 32 of 45   Page ID #:205
Case 2:11-cv-04197-VAP -E   Document 13-1   Filed 09/26/11   Page 30 of 46   Page ID
#:111

1  "is a probability sufficient to undermine confidence in the outcome."

2  Id. at 694.  "That requires a 'substantial,' not just 'conceivable,'

3  likelihood of a different result."  Cullen v. Pinholster, 131 S. Ct.

4  1388, 1403 (2011) (quoting Harrington v. Richter, 131 S. Ct. 770, 791

5  (2011)).  The court may reject the claim upon finding either that

6  counsel's performance was reasonable or the claimed error was not

7  prejudicial.  Id. at 697; Rios v. Rocha, 299 F.3d 796, 805 (9th Cir.

8  2002) ("Failure to satisfy either prong of the Strickland test

9  obviates the need to consider the other.") (citation omitted).

10

11       Review of counsel's performance is "highly deferential" and there

12  is a "strong presumption" that counsel rendered adequate assistance

13  and exercised reasonable professional judgment.  Williams v. Woodford,

14  384 F.3d 567, 610 (9th Cir. 2004), cert. denied, 546 U.S. 934 (2005)

15  (quoting Strickland, 466 U.S. at 689).  The court must judge the

16  reasonableness of counsel's conduct "on the facts of the particular

17  case, viewed as of the time of counsel's conduct."  Strickland, 466

18  U.S. at 690.  The court may "neither second-guess counsel's decisions,

19  nor apply the fabled twenty-twenty vision of hindsight. . . ."

20  Matylinsky v. Budge, 577 F.3d 1083, 1091 (9th Cir. 2009), cert.

21  denied, 130 S. Ct. 1154 (2010) (citation and quotations omitted); see

22  Yarborough v. Gentry, 540 U.S. 1, 8 (2003) ("The Sixth Amendment

23  guarantees reasonable competence, not perfect advocacy judged with the

24  benefit of hindsight.") (citations omitted).  Petitioner bears the

25  burden to show that "counsel made errors so serious that counsel was

26  not functioning as the counsel guaranteed the defendant by the Sixth

27  Amendment."  Harrington v. Richter, 131 S. Ct. at 787 (citation and

28  internal quotations omitted); see Strickland, 466 U.S. at 689

1  (petitioner bears burden to "overcome the presumption that, under the

2  circumstances, the challenged action might be considered sound trial

3  strategy") (citation and quotations omitted).

4

5      "In assessing prejudice under Strickland, the question is not

6  whether a court can be certain counsel's performance had no effect on

7  the outcome or whether it is possible a reasonable doubt might have

8  been established if counsel acted differently."  Id. at 791-92

9  (citations omitted).  Rather, the issue is whether, in the absence of

10  counsel's alleged error, it is "'reasonably likely'" that the result

11  would have been different.  Id. at 792 (quoting Strickland, 466 U.S.

12  at 696).  "The likelihood of a different result must be substantial,

13  not just conceivable."  Id.

14

15      Where, as here, there has been a state court decision rejecting a

16  Strickland claim, review is "doubly deferential."  Harrington v.

17  Richter, 131 S. Ct. at 788; 28 U.S.C. § 2254(d).  A state court's

18  decision rejecting a Strickland claim is entitled to "a deference and

19  latitude that are not in operation when the case involves review under

20  the Strickland standard itself."  Harrington v. Richter, 131 S. Ct. at

21  785.  "When § 2254(d) applies, the question is not whether counsel's

22  actions were reasonable.  The question is whether there is any

23  reasonable argument that counsel satisfied Strickland's deferential

24  standard."  Id. at 788.  "[E]ven a strong case for relief does not

25  mean the state court's contrary conclusion was unreasonable."

26  Harrington v. Richter, 131 S. Ct. at 786.  "[T]he range of reasonable

27  [Strickland] applications is substantial."  Id. at 788; 28 U.S.C. §

28  2254(d)(1).

1    **B.   Background**

2

3        Gang expert, Detective Michael Valento, testified concerning his

4    experience investigating various Crips gangs, including the 111

5    Neighborhood Crips (R.T. 2411-17).   Detective Valento testified that

6    the primary activities of the 111 Neighborhood Crips are firearm-

7    related assaults and felony vandalism (R.T. 2416-17).   Detective

8    Valento said that it is not uncommon for Crips to wear red to

9    "infiltrate Blood gangs" to get closer to Blood gang members for

10   "missions," i.e., to target gang members for retaliation or to commit

11   a shooting against a rival gang (R.T. 2414-15).   Detective Valento

12   explained, "[t]raditionally, [gang members] will go in and if they

13   don't know the specific gang member that they're targeting, they will

14   go into the rival neighborhood and commit an act of violence upon

15   usually young African-American male blacks" (R.T. 2415).

16

17       The prosecution proposed a hypothetical to the expert outlining

18   the events that occurred from the time Johnson allegedly called Njie

19   about "putting in work" through the shooting of Salcedo in the Honda,

20   and asked if the expert would have an opinion concerning whether the

21   shooting was committed for the benefit of, at the direction of, or in

22   association with the 111 Neighborhood Crips (R.T. 2426-2427).   With no

23   objection, Detective Valento answered:

24

25       I believe it's at the benefit of and direction and the

26       association with the gang, and that is due to the fact that

27       it's at the direction of in that hypothetical that

28       individual obtains a gun and says that they're going on a

1   mission to avenge for a fellow gang member's shooting.  Any

2   acts of violence related to that is definitely going to be

3   at his direction.

4

5       It's in association with the gang members and the

6   individuals who went with him on that mission in that car,

7   as well as the Mustang who obviously followed through the

8   chase and then met up afterwards.

9

10      And it's for the benefit of the gang.  It's the

11   Neighborhood Crips going out to avenge individuals – or

12   avenge the shooting of their individual homeboy that had

13   been killed a few days prior.  By going out and avenging

14   that killing, it's going out and showing that the

15   Neighborhood Crips are a violent gang, they're not going to

16   stand by while you go out and gun them down.

17

18      And by doing that, that instills fear and intimidation

19   amongst not only other rival gangs, but the community and by

20   upholding, keeping that reputation of being a violent street

21   gang, it assists you in your criminal conduct.  It helps you

22   get away with criminal activity because witnesses don't want

23   to come to court, witnesses don't want to testify, they

24   don't want to inform law enforcement about the gang's

25   activities.  And that's how their activity benefits the

26   gang.

27

28 (R.T. 2427-28).  The prosecution asked how the shooting involving the

                                33

1   Honda, which occurred in 111 Neighborhood Crips territory, would have

2   anything to do with a mission (R.T. 2428-29).  Without objection,

3   Detective Valento answered:

4

5        Well, in this scenario at the intersection, they are in

6        route [sic] or planning to start the night off with their

7        mission in this hypothetical, and during the course of that

8        mission they were sideswiped by individuals in the other

9        car.  That could be viewed as complete disrespect.

10

11       Clearly in this hypothetical they were disrespected by

12       the rival gang shooting them a few days prior.  So any kind

13       of disrespect towards them in their own neighborhood, the

14       threshold for that is not going to be tolerated at all.

15

16   (R.T. 2429).  The prosecution continued:

17

18   Q.   In this hypothetical, I told you that the people in

19        that victim vehicle were Hispanics. . . . Does – you

20        said that they normally go on a mission to attack rival

21        gang members.  In this case you said African-American

22        males.   ¶ So tell us how that fits in?

23

24   (R.T. 2429).  Detective Valento answered:

25

26       The Neighborhood Crips – I left nine months ago, but as

27       far as I know they have no rivalries with Hispanic gangs

28       right now.  But the fact that simply because those Hispanics

1        happened to disrespect them in their neighborhood, they were

2        unfortunately going to reap the violent act of the gang

3        because they were already fired up in the hypothetical and

4        wanted to avenge a friend's death.  So it was an unfortunate

5        set of events for these Hispanics to come in.  ¶ And as the

6        gang in this hypothetical thought they were sideswiped, in

7        my opinion, being disrespected in the neighborhood, and they

8        weren't going to tolerate any more disrespect.

9

10  (R.T. 2430).

11

12     The prosecutor then posed a second hypothetical concerning the

13  events happening after the Salcedo shooting that led to shots being

14  fired at Grant and Kelly, and asked if the expert would have an

15  opinion regarding whether those shootings were committed for the

16  benefit of, at the direction of, or in association with the 111

17  Neighborhood Crips (R.T 2430-31).  Without objection, Detective

18  Valento answered:

19

20        Again, this was their original mission after – in the

21        hypothetical, after shooting and killing the male Hispanic,

22        they went into the rival neighborhood and encountered two

23        male blacks, African-Americans in that – who were in the age

24        range of what they perceive as a gang member, and in the

25        hypothetical they end up targeting them and shooting at

26        them, both cars, the Saturn and the Mustang, so clearly it's

27        in association with two members of the gang and the people

28        in those cars.  It's for the benefit of because they are in

Case 2:11-cv-04197-VAP-E   Document 15   Filed 11/08/11   Page 38 of 45   Page ID #:211
Case 2:11-cv-04197-VAP -E   Document 13-1   Filed 09/26/11   Page 36 of 46   Page ID
#:117

1  that rival territory inflicting firearm-related violence,

2  avenging the homeboy that had been shot a few days prior,

3  and that benefits the gang in general.

4

5  And it was at the direction of an individual, a known

6  111 Street gang member, who at his direction said they were

7  going on a mission to avenge the friend's shooting.   And

8  again, that shooting, as I stated earlier, benefits the gang

9  by upholding their violent reputation amongst the community

10  and other rival gangs.

11

12  (R.T. 2431-32).   The prosecution asked whether the fact that one of

13  the individuals might have been wearing red in Avenue Pirus territory

14  affected the opinion, and Detective Valento replied: "The fact that

15  they were wearing red, as I stated earlier, when they're on a mission,

16  it's not uncommon to wear the enemy's colors so you can get closer to

17  them.   While you're circling the neighborhood, you won't be viewed as

18  rivals."   (R.T. 2432).

19

20  On cross-examination, Bennett's counsel and Johnson's counsel

21  began asking Detective Valento questions about his opinion concerning

22  whether the crimes were committed for the benefit of, in association

23  with, or at the direction of a street gang, and whether certain facts

24  from the incidents (and not just a hypothetical) would change

25  Detective Valento's opinion (R.T. 2469-76, 2483-85, 2486-91).

26

27  On redirect, the prosecution asked Detective Valento whether a

28  non-gang member could commit a crime benefitting the 111 Neighborhood

Case 2:11-cv-04197-VAP-E  Document 15  Filed 11/08/11  Page 39 of 45  Page ID #:212
Case 2:11-cv-04197-VAP -E  Document 13-1  Filed 09/26/11  Page 37 of 46  Page ID
#:118

1  Crips and Valento replied:

2

3          Well, in this case, we'll take Defendant Moore, for

4       instance, being in a car.  As far as I know, he has no gang

5       self-admission, no gang tattoos, but he's in a car, going on

6       a mission in rival hood. . . community, shooting against

7       suspected Avenue Piru gang members.  The gang in that rival

8       hood is going to think that the Neighborhood Crips did that

9       shooting regardless of whether Jonathan is actually shooting

10      or not.  That shooting is attributed to the gang, so what

11      Jonathan did helps the reputation of the 111 Neighborhood

12      Crips even though he's not in the gang.

13

14  (R.T. 2502).

15

16      C.    **Discussion**

17

18      Petitioner contends his counsel rendered ineffective assistance

19  by failing to object to Detective Valento's testimony.  Applying the

20  Strickland standard, the Court of Appeal rejected this contention,

21  finding that counsel was not ineffective for failing to object to

22  Detective Valento's testimony since Detective Valento's testimony was

23  admissible under California law (Respondent's Lodgment 10 at 18-19).

24  The Court of Appeal acknowledged that under California law a gang

25  investigator is prohibited from offering an opinion of the knowledge

26  or the intent of an accused.  See Respondent's Lodgment 10 at 20

27  (citing, inter alia, People v. Gonzalez, 38 Cal. 4th 932, 946, 44 Cal.

28  Rptr. 3d 237, 135 P.3d 649 (2006), cert. denied, 549 U.S. 1140 (2007),

37

1 | and <u>People v. Gardeley</u>, 14 Cal. 4th 605, 618, 59 Cal. Rptr. 2d 356,
2 | 927 P.2d 713 (1996), <u>cert. denied</u>, 522 U.S. 854 (1997)).  However, the
3 | Court of Appeal found that Detective Valento's testimony was not
4 | tantamount to an opinion as to the defendants' guilt, but was merely
5 | an opinion that, under the assumptions in the hypotheticals posed, the
6 | offenses assumed in the hypotheticals would have been committed for
7 | the benefit of or at the direction of a criminal street gang
8 | (Respondent's Lodgment 10 at 20).  The Court of Appeal's determination
9 | was not unreasonable.

10 |

11 | First, counsel reasonably could have determined that objecting to
12 | the testimony would have been futile and might have caused the jury to
13 | focus unduly on Detective Valento's opinion.  Under California law,
14 | the culture and habits of street gangs are matters sufficiently beyond
15 | common experience as to render expert testimony on such matters
16 | admissible.  <u>See</u> <u>People v. Gardeley</u>, 14 Cal. 4th 605, 617, 59 Cal.
17 | Rptr. 2d 356, 927 P.2d 713 (1996); Cal. Evid. Code § 801(a).  "Gang
18 | sociology and psychology are proper subjects of expert testimony .
19 | . . ."  <u>People v. Hill</u>, 191 Cal. App. 4th 1104, 1121, 120 Cal. Rptr.
20 | 3d 251 (2011) (citations omitted).  "Expert testimony is admissible to
21 | establish the existence, composition, culture, habits, and activities
22 | of street gangs; a defendant's membership in a gang; gang rivalries;
23 | the motivation for a particular crime, generally retaliation or
24 | intimidation; and whether and how a crime was committed to benefit or
25 | promote a gang."  <u>Id.</u> (citation omitted).  It is not error to admit
26 | expert testimony, using hypothetical questions "related to defendant's
27 | motivation for entering rival gang territory and his likely reaction
28 | to language or action he perceived as gang challenges."  <u>See</u> <u>People v.</u>

1  Ward, 36 Cal. 4th 186, 210, 30 Cal. Rptr. 3d 464, 114 P.3d 717 (2005),

2  cert. denied, 547 U.S. 1043 (2006).  Petitioner's counsel reasonably

3  could have concluded that Detective Valento's testimony was proper

4  under these standards.  The failure to object in such circumstances is

5  not deficient performance.  See Rupe v. Wood, 93 F.3d 1434, 1445 (9th

6  Cir. 1996), cert. denied, 419 U.S. 1142 (1997) (failure to take futile

7  action can never be deficient performance); Baumann v. United States,

8  692 F.2d 565, 572 (9th Cir. 1982) (failure to raise meritless legal

9  argument does not constitute ineffective assistance of counsel); see

10  also Hassan v. Morawcznski, 405 Fed. App'x 129, 132 (9th Cir. 2010),

11  pet. for cert. filed, 80 USLW 3055 (Apr. 20, 2011) (counsel's failure

12  to object to certain testimony was reasonable, where counsel "might

13  have elected not to object for acceptable or strategic reasons");

14  Morris v. State of Calif., 966 F.2d 448, 456-57 (9th Cir. 1991), cert.

15  denied, 506 U.S. 831 (1992) (counsel's failure to object to

16  prosecutor's question whether defendant had ever used cocaine was a

17  tactical decision and hence not ineffective); see also Charles v.

18  Thaler, 629 F.3d 494, 502 (5th Cir. 2011) (counsel's decision not to

19  draw undue attention to witness' statement by objecting was reasonable

20  trial strategy); United States v. Allen, 390 F.3d 944, 951 (7th Cir.

21  2004) (counsel's failure to object to admission of photograph of

22  defendant in custody not ineffective, as counsel reasonably could have

23  chosen "to avoid drawing greater attention to the photograph"); Lara

24  v. Allison, 2011 WL 835594, at *12 (C.D. Cal. Jan. 12, 2011), adopted,

25  2011 WL 845008 (C.D. Cal. Mar. 7, 2011) (counsel reasonably could have

26  concluded that objecting to gang expert's brief reference to purchase

27  of legal representation by gang members would have "drawn undue

28  attention to the comment") (footnote omitted).

1      Second, Petitioner has not shown a reasonable and substantial

2  probability of a different result had counsel objected to Detective

3  Valento's testimony, even assuming that the trial court would have

4  sustained any such objections.  As summarized above, Njie testified

5  that Johnson had wanted to "put in work" or "shoot somebody" for

6  Johnson's friend who had been killed (R.T. 1317-19).  On the day of

7  the incident, Johnson told Njie to come over to a house on 108th

8  Street to "put in some work" (R.T. 1320-22, 1376, 1378-79).[16]  Njie

9  picked up Johnson at the house and then picked up Bennett and

10  Petitioner at Bennett's house (R.T. 1321-34, 1378, 1383-84).[17]  When

11  Johnson later shot Jose Saucedo, Njie reportedly was nervous, although

12  he had expected that the men would shoot people that evening since

13  they were going to "put in work" (R.T. 1344, 1374, 1378).  The men

14  regrouped after the shooting and went out again to drive through the

15  Blood gang neighborhood of the Avenue Pirus to shoot someone because

16  it was believed that an Avenue Pirus member had shot Johnson's friend

17  (R.T. 1354, 1404-05, 1412-13, 1527-28, 1575).  Njie testified that the

18  men targeted Grant and Kelly in the Caprice because Njie thought the

19  men were Avenue Pirus members (R.T. 1357, 1414-15, 1576).  From this

20  evidence alone, the jury reasonably could have inferred that the

21  crimes were committed for the benefit of, at the direction of, or in

22  association with a criminal street gang, with the intent to promote,

23

24      [16]    Njie had told police that Johnson was a member of the

25  111 Neighborhood Crips (R.T. 1354-56, 1372).  Detective Valento
testified that the house was a main gathering point for

26  Neighborhood Crips at the time (R.T. 2435).

27      [17]    In Petitioner's statement to the police, he said he
understood Johnson as saying, "We got to ride," which meant "we

28  got to go shoot somebody" (C.T. 827).

1  further, or assist in any criminal conduct by gang members.

2  Considering this evidence, fairminded jurists could conclude that

3  there was no reasonable probability of a different result at

4  Petitioner's trial, even had counsel objected successfully to the

5  expert's testimony.  Harrington v. Richter, 131 S. Ct. at 792.

6

7        Additionally, as the Court of Appeal observed (Respondent's

8  Lodgment 10 at 20), the trial court instructed the jury that an expert

9  opinion is only as good as the facts and reasons on which the opinion

10  is based, that the jury was not bound by an expert's opinion, and the

11  jury could disregard any opinion it found unreasonable (C.T. Moore

12  97).  The trial court also instructed the jury regarding hypothetical

13  questions to the expert:

14

15        In permitting [hypothetical] question[s], the court does not

16        rule, and does not necessarily find that all of the assumed

17        facts have been proved.  It only determines that those

18        assumed facts are within the possible range of the evidence.

19        It is for you to decide from all the evidence whether or not

20        the facts assumed in the hypothetical question have been

21        proved.  If you should decide that any assumption in a

22        question has not been proved, you are to determine the

23        effect of that failure of proof on the value and weight of

24        the expert opinion based on the assumed facts.

25

26  (C.T. Moore 97).  The jury is presumed to have followed these

27  instructions.  See Weeks v. Angelone, 528 U.S. 225, 226 (2000).

28  Under these circumstances, Petitioner has not shown Strickland

1  prejudice.

2

3       For the foregoing reasons, the Court of Appeal's rejection of

4  this claim was not contrary to, or an objectively unreasonable

5  application of, any clearly established Federal law as determined by

6  the United States Supreme Court.  See 28 U.S. § 2254(d); Harrington v.

7  Richter, 131 S. Ct. at 785-87.  Petitioner is not entitled to habeas

8  relief on Ground Five of the Petition.

9

10                         **RECOMMENDATION**

11

12      For the foregoing reasons, IT IS RECOMMENDED that the Court issue

13  an Order: (1) accepting and adopting this Report and Recommendation;

14  and (2) denying and dismissing the Petition with prejudice.

15

16      DATED:  September 26, 2011.

17

18

19                    _____/S/_____
                          CHARLES  F.  EICK
20                   UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

27

28

1  **NOTICE**

2      Reports and Recommendations are not appealable to the Court of

3  Appeals, but may be subject to the right of any party to file

4  objections as provided in the Local Rules Governing the Duties of

5  Magistrate Judges and review by the District Judge whose initials

6  appear in the docket number.  No notice of appeal pursuant to the

7  Federal Rules of Appellate Procedure should be filed until entry of

8  the judgment of the District Court.

9      If the District Judge enters judgment adverse to Petitioner, the

10 District Judge will, at the same time, issue or deny a certificate of

11 appealability.  Within twenty (20) days of the filing of this Report

12 and Recommendation, the parties may file written arguments regarding

13 whether a certificate of appealability should issue.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28